# EXHIBIT D

*William H. Whyte*

# WILLIAM H. WHYTE

# CITY

## REDISCOVERING THE CENTER

PHOTOS BY THE AUTHOR



ANCHOR BOOKS
DOUBLEDAY
NEW YORK  LONDON  TORONTO  SYDNEY  AUCKLAND

[32]                                                                    CITY

*Are there not lessons in the vendors' success? If these rascals thrive so, they must be providing something people like. It is the marketplace at its most basic—face to face, mano a mano, as it is and has been in alleys and souks and bazaars all over the world.*

Merchants will keep up the fight against vendors—all kinds—but victory will continue to be elusive. It always has been. Over the years vendor regulations have fluctuated in degree of severity, sometimes leaning toward permissiveness. But these shifts do not make much practical difference. Even at their most liberal, the regulations are so full of nullifying stipulations that were they enforced to the letter there could be no more vendors at any place at any time. And this is not tenable.

Over time you cannot enforce a law that is against something people like. There is a parallel here to Prohibition. Authority is being refuted by the marketplace. People are told that food vending is bad for downtown business, bad for traffic, bad for them and their health. But people do not believe this. They like eating out-of-doors. They like the choices. They like the prices. They prefer a hot dog and a soda they can afford ($1.65) to a fuller lunch they cannot. So they buy. The vendors are providing what the established order is not.

There is a vacuum and it is of the city's own making. Take New York's Sixth Avenue. Once it was lined with places to eat: delis, cafeterias, Irish bars, coffee shops. New office building construction, spurred by incentive zoning, did away with these places. In their stead were plazas and bank windows. But no food. Not even a snack. Then vendors came. Then more. Today the sidewalks are full of them, lined up sometimes six to eight in a row. The revenge of the street.

## Entertainers

Probably the finest street entertainer of our time is Philippe Petit. I was lucky enough to catch one of his first performances after he arrived from Paris. It was on upper Fifth Avenue at the Pulitzer Fountain. A gamin-like fellow with a battered high hat was stringing a tightrope between two trees. As a crowd began to gather, he got on a unicycle and pedaled around, simultaneously juggling some balls. He was obviously a master of the use of props.

The prop that he was to use best was a policeman. For the climax of his act, Petit got up on the tightrope, lit three batons, and proceeded to juggle them as he went across. The crowd applauded vigorously. Petit dismounted and made the rounds of the crowd with outstretched hat. At this point a friendly black cop who had been enjoying the show from the rear came forward. Petit looked stricken. He recoiled as if hit. "Don't hit him," someone shouted. The crowd was angry. Outraged at this display of police brutality, people pressed additional contributions on Petit, who had sufficiently recovered from his terror to make another round. As the bemused cop looked on, Petit mounted his unicycle, doffed his hat, and made his getaway.

*Street People*                                                              [33]

Several weeks later, at seven-thirty in the morning, people around the World Trade Center looked up in amazement. On a wire between the two towers, 1,150 feet in the air, a figure was walking back and forth with a balancing rod. With an accomplice, Petit had gained access to a tower the night before and, with a crossbow, shot a rope and then pulled a metal cable across to the other tower. "When I see two oranges, I want to juggle. When I see two towers, I want to go across."

By quarter of eight a tremendous crowd had gathered. Traffic was stopped dead. For thirty minutes Petit performed. He would get down on one knee, get up, go back and forth; once he almost teetered into a fall. If there had been people on the street collecting for him, the take would have been a fortune. "I was happy," Petit recalled. "I was dying with happiness."

Petit was arrested. But the city government was rather pleased with the kind of publicity he generated. Petit was sentenced to give a special public performance. At street level.

Few street entertainers are in a class with Petit, but there are many talented ones. Some of them are professional; most are part-time —students, unemployed actors. One of the best ventriloquists in New York one summer was a Princeton philosophy major. The largest single category is "music students"; to judge by the signs, a large part of the street population is working its way through Juilliard. There are many musical groups, some pickup and some semipermanent—for example, the Fly-by-Night String Band, the Illusionary Free Lunch Band.

One way or another they all make a pitch for money. They pass the hat, they have someone pass it, or they have an empty instrument case or box in front of them. Propped up on it may be a hand-lettered sign with an admonition. People are very curious to see what it says.

"No credit cards please."

"Be a patron of the arts."

"Support live music."

"Send this weird boy to camp."

One black saxophonist had a sign that said "Send me back to Africa." He had done very well with it. "The blacks chip in because they want me to see their roots," he said. "The whites wish we'd all go back and figure it might as well start with me."

The donation and receiving of money is part of the performance. As with beggars, there is a strong domino effect; if two or more people stop to put in money there will likely be a rapid succession of givers. The entertainers usually acknowledge the donations with a smile and a thank-you. A musician may salute with a few high notes. The accepting, in sum, is done with grace. Rarely do entertainers express discourtesy to those who do not give.

[34]                                                   CITY

Entertainers are a temperamental lot, many with large egos. But there is a good bit of occupational camaraderie among them. They are cooperative in settling territorial problems. On a busy afternoon they will work out a loose agreement as to who will play when at a key public space. At the steps of the Metropolitan Museum of Art, for example, there may be four or five acts waiting to go on but none will encroach on the one that is playing. While they are waiting, they serve as a volunteer claque and vigorously applaud the others' acts.

The same is true at London's Covent Garden and of the *ataliers* at Centre Pompidou in Paris. At both places there appears to be a tacit understanding that acts stay within a ten-to-fifteen-minute period. Both places have enough space to accommodate a number of concurrent acts, but entertainers dislike this kind of competition.

The size of the space is not the important factor for entertainers. They would as soon squeeze people in as not. What entertainers most look for is a place with a strong *flow*—a constantly self-renewing audience of regulars, such as office workers, and of tourists. Among the best places in midtown New York are the steps of the New York Public Library, the steps of St. Thomas Church, Grand Army Plaza, the mall in Central Park. Street corners can work very well. One of the very best is Fifty-ninth and Fifth. For individual musicians it is the closest thing to playing the Palace. The New York *Times*'s William Geist tells of listening to an excellent saxophonist there, Ray Peters. A woman put fifty cents in his case. "You're an exceptionally gifted young man," she said. "You'll make the big time someday."



*Street People*                                                    [35]

"Madam," he called after her, "this *is* the big time."

In Boston the best space is in the Common at the Park Street station. In San Francisco one of the best places is Ghirardelli Square. It is so popular that entertainers must be auditioned by the managements before they can play there.

How do they like street performing? They are of several minds. Some say they do not like it; they feel that it is degrading, that there is no future in it. But most of them say that they enjoy it, the good parts at least. "It's terribly insecure," says one, "but I like the insecurity of it." Entertainers speak of free choice, the give-and-take with people, the honing of one's skills, the immediacy of the audience.

They also speak of what it is like when there is no audience, and of the humiliation of performing when no one stops to look or listen.

"I haven't yet hardened myself to the rejection and in this line of work there is rejection right and left," says a ventriloquist. Sometimes he talks to his dummy on a park bench for as much as twenty or thirty minutes—alone. It is a bitter wait. But then someone stops and listens, and then another stops. Soon there will be an audience.

Entertainers praise the toughness of street audiences and say that of all audiences, New Yorkers are the toughest. But also the most appreciative. If you can collect from them, they say, you've got to be good, which is to say that they are pretty good themselves.

It is interesting to watch people as they chance upon an entertainer. So often they will smile. A string quartet. Here at Forty-fourth! Their smile is like that of a child. For these moments they seem utterly at ease, their shoulders relaxed. People enjoy programmed entertainment, too, but not the same way. It is the unexpected that seems to delight them most.

> It is interesting to watch people when they chance upon an entertainer. So often they will smile. A string quartet! . . . Their smile is like that of a child.

Street entertainers can have a strong binding effect on people. This is particularly the case when the entertainer is skillful in involving members of the audience in the act—like magician Jeff Sheridan, who borrows a businessman's coat and then appears to burn a hole in it; who gets a pretty girl to take off her straw hat, from which he produces a bottle of beer. How did he do it? Watch his left hand, someone says. No, it was up his sleeve, says another.

Sheridan is very skillful. But even a bad performer can unify a crowd. There is one magician who has a perfectly dreadful act and his patter is so corny that one almost has to say something about it. But he does get people involved and his inept performance provides a connection between them.

There is a communal sense to these gatherings and though it may be fleeting, it is the city at its best. I remember especially the end of a mime's act in front of Pulitzer Fountain at Fifty-ninth Street. The mime was making fun of people. He walked up to two junior execu-

[36]                                                          CITY

tives and drew a square in the air over them. Everyone laughed, even the junior executives. Then a cop walked across the plaza with a side-to-side swinging gait. The mime walked behind with the same side-to-side swinging gait. The cop saw people laughing, looked over his shoulder at the mime, laughed, and then turned to the mime and shook his hand. The crowd applauded. It was a splendid moment, a very city kind of moment.

Historically, the police have warred against street entertainers, or, to be more accurate, have been made to war. Left to their own judgment, cops usually take a live-and-let-live stance. When one does move against an entertainer he may tell him he's sorry, but the captain has been on his back. And he has been so because the merchants have been on his back.

*Merchants have been the main force against street entertainers. It is odd that people who champion the free market are against such a pure expression of it.*

Merchants have been the main force against street entertaining, and it has been largely on their say-so that city councils have passed repressive ordinances against it. One feature of such ordinances is a prohibition against soliciting money. The vehemence of the phrasing in New York's old hurdy-gurdy law well conveys authority's attitude: "It is unlawful to solicit, ask, or request money in any way, shape or manner, directly or indirectly." The old statute was repealed in 1970 but the spirit lives on. Street entertaining is legal, but only if

1. not much noise is made.
2. the sidewalk is not obstructed.
3. there is no solicitation for money.

It is odd that people who champion the free market are against such a pure expression of it. What is so wrong about solicitation? The passersby are under no duress. They don't even have to stop. If they do stop they don't have to give. If they give, the amount is entirely up to them and their judgment of the worth of the entertainer. It is the latter who has taken the entrepreneurial risk. He should be entitled to some reward.

Merchants say that the entertainers have hurt their business and future inundations would make matters far worse. Michael Grosso, head of the Fifth Avenue Association, puts it this way: "If you allow one musician or peddler in, then you have to let them all in and they would take over the whole midtown area."

I wish I could say that our research proved that street entertaining is good for the merchants' stores. I think it is, but our research does not prove this. What it does prove is that there is a high degree of compatibility between a strong retail street and a lively street life. Merchants do not see this. They do not like much about street life anyway, except for customers coming in the door. Entertainers block

them, the merchants complain, and block everybody else, to the point of endangerment. It is on this basis, pedestrian safety and amenity, that the merchants have mounted their legislative assaults on the entertainers.

There have been two federal cases. Both of them, fortunately, deal with physical situations that almost spectacularly belie the ordinances.

The first was *Davenport v. the City of Alexandria.* Lee Davenport was a music teacher who played his bagpipes on the streets of Alexandria. The city forbade him to do this. At the behest of merchants the city enacted an ordinance that banned street entertainers from performing on any of the sixty-one blocks of the central district and restricted them to certain designated park areas. Davenport did not want to play in the designated park areas. There were not enough people there. He wanted to play on the sidewalk, in particular the sidewalks of the two most attractive blocks of King Street. He sued to have the ordinance struck down. The case went to the U.S. District Court.

The city's case was based largely on assertion. Some merchants had been reported to observe instances of sidewalk blocking. The city manager said that once he had seen people pour out onto the street because of an entertainer. A check of the actual facts belied the claims of congestion. As a witness for Davenport, I was able to point out that the city's own counts and the measurement of the sidewalk showed there was an excellent balance between sidewalk space and pedestrian flows. In this respect, indeed, Alexandria was outstandingly well provided—not only the two blocks in question but the whole central district.

Judge Albert V. Bryan struck down the ordinance. Here are some of the reasons he cited:

> The court is unpersuaded that there is any actual safety endangerment, any real impediment of pedestrian traffic or any substantial interference with patrons of businesses even in the affected area . . . Furthermore, more persuasive testimony satisfies the court that, overall, pedestrian traffic is not congested—no more than 2.8 persons per foot per minute of passing pedestrians, a pedestrian "ease" level well below the standard for pedestrian comfort.

As to the designated park areas, the judge held that they were not an adequate alternative to the sidewalk:

> The exponent of the First Amendment expression is entitled to be "encountered" by those he wishes to receive his or her message. The sidewalk is a traditional place for such expression. Pedestrian flow and turnover is the "life blood" of the street performer.

[38]                                                              CITY

The city appealed. The U.S. Court of Appeals reversed Judge Bryan's decision in part. It found that the ordinance was a reasonable regulation. It was not sure, however, that it was drawn "as narrowly as possible to maximize speech while securing the city's interest in public safety." It sent the matter back to the District Court, asking Judge Bryan to make explicit the factual reasons for holding the ordinance unnecessarily broad. How wide were the streets? What were the pedestrian flows? There was ample documentation on these points. By making them explicit, Judge Bryan re-established his original finding. There was plenty of room.

The second federal case was in Chicago. For quite a while the city had been hospitable to street entertainers. In the summer of 1979 Mayor Jane Byrne had the city hire a corps of young entertainers to perform at bus stops and transit stations during the summer. (Pay: ten dollars an hour.) People were delighted. STREET ARTISTS HELP CITY SPARKLE, said an editorial in the Chicago *Sun Times.*

But the merchants did not like street entertainers, anywhere. In 1982 they prevailed on the city council to pass an ordinance that would effectively ban them from the upper Michigan Avenue area—that is, the place most suited for them.

Guitarist Wally Friedrich initiated a class action suit against the city, and the American Civil Liberties Union joined in support. I served as expert witness on the pedestrian aspect.

The city's contention was that congestion on the sidewalk had reached drastic levels, and that entertainers added sorely to this congestion and should be banned, providing more room for pedestrian safety and amenity.

It was an extraordinary complaint. Of all the avenues in the United States, they could not have picked one with broader sidewalks than upper Michigan Avenue. They range between thirty and thirty-five feet in width. Pedestrian volumes were strong but did not tax them. My sampling counts and the city's counts jibed. The amount of space per pedestrian was very generous and provided a level of service that rated an A by anybody's computation.

There was, indeed, almost a surfeit of space. The city itself had judged there was so much space it had encouraged the withdrawal of large chunks of sidewalk space for roped-off planting beds. Were these grassy expanses converted back to sidewalk space, the level of service would be higher yet.

In *Friedrich v. Chicago* the court upheld the ordinance in part and denied it in part. The court found that the city was within its rights to curb street entertaining when it endangered the public safety. It also found that the ban was much broader than necessary. On Michigan Avenue all performances were banned on Saturdays and Sundays, and

on weekdays from 11 A.M. to 2 P.M. and from 4 P.M. to 11 P.M. The court observed that the city had not done any homework to support these sweeping restrictions, and that its own records indicated that pedestrian flows diminished dramatically after 7 P.M. Rush Street was another matter. It is the city's disco, tavern, and café strip and gets lots of pedestrian traffic after dark, especially on Friday and Saturday nights. But this did not justify a ban starting at 3 P.M., the court found, nor one on Wednesday nights.

The most interesting part of Judge Marven E. Aspen's decision concerns break dancing. As in New York, so in Chicago break dancing surfaced as a fad in 1983. Everywhere one looked, it seemed, young blacks were staking out large swaths of sidewalk and doing acrobatics. Some were terrible—a few people jumping up and down to a portable tape player. But some were really quite talented and put on a show that attracted large crowds. It was these crowds, Judge Aspen noted, that caused most of the mischief.

But break dancing peaked in 1984 and is now performed only sporadically. This raises a question. If break dancing was the only major threat to public safety and if it has largely disappeared, why then the ordinance? In a section that could be subtitled "Much Ado About Break Dancing" Judge Aspen tackles the question:

> If it is true that breakdancing has gone the way of the hula hoop and is a faded fad, then perhaps the frequency of large audiences has substantially fallen . . . Thus, if the City chooses to renew the ordinance next year, it would be well advised to consider the passing of the breakdancing phenomenon in its evaluation. If it has passed, and if—as the evidence showed—most other performers attract only small crowds, the constitutional underpinnings of the ordinance may have vanished for future years.

## Handbill Passers

For all the differences in people, times, and places, the rhythms of handbill passing and taking are surprisingly regular. If the passer makes any effort at all—that is, stands near the center of the sidewalk and actually offers handbills to passersby—the completion rate will run at least 30 percent or three out of every ten persons. The rate will vary according to pedestrian flow, character of flow, and time of day, but by far the most important factor will be the handbill passer himself and the assertiveness of his technique. Somewhat like the staccato patterns of donations to beggars, the taking of handbills tends to occur in bunches. In part this is due to the follow-the-leader tendency of the people who take handbills. But close analysis of the film record of

*Like the staccato pattern of giving to beggars, the taking of handbills tends to come in bunches. Partly this is due to the follow-the-leader tendencies of the takers. But it is also due to the handbill passers' psyche. Success emboldens them. Their bearing becomes more assertive, their thrust more decisive.*