# EXHIBIT E



September 3, 2004

## Killjoy was here

**Boston has long relied on onerous regulations to kick street performance to the curb. Now itinerant artists are fighting back in the courts.**
BY HARVEY A. SILVERGLATE AND DAN POULSON



WITH THE POSSIBLE exception of a Moroccan marketplace, few places are as vibrant and energetic as Harvard Square on a typical summer afternoon. Immediately upon exiting the Church Street T stop, startled visitors find that they've been pitched headfirst into a simmering crock pot of creative talent: tattooed art students crouch on the sidewalk selling their paintings, musicians and rappers with amplifiers test out their newest compositions, tap dancers perform on makeshift platforms, and aspiring actors improvise one-act plays. This aesthetic tumult may be Cambridge's signature trait; for as long as anyone cares to remember, street performances have been an integral part of the square's allure, lending the area its distinctive flavor and helping to attract the millions of visitors who do much to drive its local economy.

*STEPHEN BAIRD, executive director of Community Arts Advocates, offered his talents to a test case he hopes will force reform.*

Standing in stark contrast to the hurly-burly in Cambridge is the relatively moribund scene one finds on the other side of the Charles River. Even in parts of Boston that seem like natural artists' habitats, such as Newbury Street and Boston Common, creative public expression is not just scarce but actively discouraged — even illegal. Itinerant artists who venture into restricted neighborhoods and public parks run the risk of being harassed by irritated residents who've grown accustomed to their culturally sterile surroundings, or approached by police officers who warn them to pack up their things and move on. Those who persist in performing can be, and sometimes are, arrested.

As the US claims to combat the threat of domestic terrorism, in part by creating so-called free-speech zones at mass political demonstrations such as those held at the Democratic and Republican National Conventions, public free speech has suddenly become a socially explosive and legally

contentious subject. But street musicians' specific claim to First Amendment protection was settled long ago and therefore is not really a part of the current legal dispute. During recent decades, numerous court battles have explicitly determined what public-safety and other such interests justify the regulation of free speech in public spaces. And by anyone's account, Boston's ordinances don't come anywhere close to meeting those requirements.

FRUSTRATED BY years of discrimination and repeated attempts to negotiate with the city, Community Arts Advocates (CAA), a Jamaica Plain–based, nonprofit coalition of artists, took the drastic step of pursuing a long-overdue federal civil-rights lawsuit to address the matter. Filed last month by the Boston law firm **Testa, Hurwitz and Thibeault** (disclosure: TH&T represents the Foundation for Individual Rights in Education, co-founded by Harvey Silverglate), the suit names, among others, the City of Boston, the Boston Police Department, and the Boston Parks and Recreation Department. CAA claims that current ordinances banning or severely restricting street performances are constitutionally invalid. CAA's executive director, Stephen H. Baird, hopes the lawsuit will compel the city to implement constitutionally appropriate legislation that grants street performers more freedom regarding where and when they can perform. Given the confusing and discriminatory institutional labyrinth street artists must navigate, that goal will require a near-total legislative makeover. Yet the city almost certainly will not win this lawsuit.

The suit's origins date to the summer of 2002, when Rosanna Lee Cohen, a folk musician known as Rosanna Lee, started performing on Newbury Street with a guitar and amplifier. Cohen had an itinerant-musician license from the Boston Police Department, but she was not aware of the permit's severe geographical and amplification restrictions — and apparently, neither were some of the police. Over the course of that summer, Cohen was the subject of complaints from a handful of Newbury Street residents, but the responding police officers, unfamiliar with the laws governing street musicians, typically left when Cohen showed them her police-issued license. However, the residents began complaining to the captain of Police District Four, and the situation quickly deteriorated. By early September, the musician had been told to move her belongings and leave the area. Her license, Cohen learned, while seeming to allow her to perform, nonetheless prohibited her from performing where people would be likely to listen.

That's when Cohen turned to Stephen Baird. Over the past 30 years, Baird, a long-time public-performance artist, has been involved in numerous challenges to street-performance bans in cities across the country. As an experiment, on June 18, Baird went to Boston Common and began playing an acoustic guitar. As described in the lawsuit, a Boston Parks Department ranger soon approached and told him that he had to obtain a permit to perform on park property. Baird returned to the Common the following day with an itinerant-musician license granted by the city, this time performing on a hammered dulcimer (a first-century precursor to the piano) before a small crowd. The same park ranger approached, but when Baird showed him his license, the ranger claimed that he needed another permit issued by the Parks Department; eventually, however, he conceded that the Parks Department doesn't actually issue performance licenses. By then, the situation was beginning to seem like a Catch-22.

Despite Boston's open hostility toward street artists, many of the important rulings concerning street performance and the First Amendment were handed down in New England. In Goldstein v. Nantucket (1979), a federal district court ruled that itinerant musicians enjoy First Amendment protection, even if they solicit donations. (Ruling otherwise would have meant that filmmakers, theaters, and newspapers, as well as street performers, couldn't charge money for their services without forfeiting free-speech protections — a patently absurd idea.) In contradicting the claim that

street performance was a form of "commercial speech" like commercial advertising, which enjoys only very limited First Amendment protection, the court instructed the town that such performance art was full-fledged protected speech and could be limited only to the extent that the government had a legitimate interest in doing so. Public safety, for example, might constitute such an interest, as would the comfort of residents trying to sleep at night. Typically, such restrictions, which have to be expressed in clear and narrow terms, may reasonably limit the time, place, and manner of expression, but they may not go further than that. Speech may be regulated, but it may not be regulated to death.

A higher-court decision in 2002, Laurel Casey v. Newport, set even greater limits on municipal regulation of public performances. The First Circuit Court of Appeals, inferior in authority only to the United States Supreme Court, determined that the no-amplification restrictions on music in the city of Newport, Rhode Island, had to be tailored in such a way that they did not substantially limit speech more than was necessary. Newport had to demonstrate not only a substantial governmental interest in restricting speech, but it also had to regulate performances in the most minimally intrusive manner possible.

Compared with the precedents established by these rulings, Boston's municipal ordinances regulating street performance seem downright primitive. As one example, Boston Municipal Ordinance 16-2.2 states that "no person hawking or peddling, selling or exposing for sale any articles, shall cry his wares to the disturbance of the peace and comfort of the inhabitants of the city." Interpreted as written, the ordinance severely restricts the sale of music or artwork on city streets. Ordinance 16-19.2 outright bars street musicians from practicing their constitutionally protected right to amplify their music, and Ordinance 16-19.1 criminalizes walking, standing, or sitting on the grass on Boston Common — a law that can be enforced selectively against artists. Yet those draconian measures seem to conflict with Ordinance 16-12.24, which allows itinerant musicians licensed by the police commissioner to "use or cause to be used any musical or noise-making instrument."

For the most part, however, the Boston Police Department's regulations are even more restrictive and legally bizarre. Consider section eight of Boston Police Rule 75, which provides that a "female licensed musician shall not play on a musical instrument in a street unless she is accompanied by an adult male licensed itinerant musician." The very presence of such a provision, even if it is not enforced, gives the entire licensing scheme an anachronistic flavor not likely to play well in a 21st-century federal court.

And if this regulation weren't questionable enough, Police Rule 75 also includes numerous geographical restraints. Itinerant musicians who obtain a license from the Boston Police Department are given a map that prescribes where and when they may perform. In much of the city, including some of its most traveled areas, street performances may occur only between the hours of 6 and 9 p.m. Among the areas included in this time-restricted zone are such natural settings for performers as Atlantic Avenue, Kneeland Street, Washington Street, Tremont Street, Park Square, Columbus Avenue, and Boylston Street. Moreover, City Hall Plaza and Dock Square are completely off-limits, since the city doesn't issue permits for those locations. (It boggles the imagination that an area like City Hall Plaza, charitably described as a bricked-over desert, would deliberately be made more barren by excluding street entertainment from its environs.) To ban musicians and street performance from such areas is the equivalent of banning New Year's Eve festivities in Times Square.

BOSTON'S STREET-performance ordinances and regulations seem impossibly oppressive and irrational, but the upside is that in this area of the law, the worse the regulations, the more likely they will be overturned. And once that happens, a replacement regulatory scheme more friendly to street performers is not hard to construct. Few remember that Cambridge's street-performance ordinance was enacted only in 1974. That legislation created the Cambridge Arts Council to regulate street performances and issue itinerant-musician licenses. While some in the Cambridge community protested the legislation when it was passed, it has hardly been ruinous to the city. If anything, the law has only improved the lives of Cambridge residents, fostering greater social interaction and meaningful artistic encounters.

Given the legal and cultural importance of public artistic expression, as well as the applicable judicial precedents, it is not difficult to predict that unless Boston cleans up its act voluntarily — and quickly — the city will undoubtedly lose the lawsuit. Furthermore, the CAA suit was randomly assigned to federal District Court judge Nancy Gertner, who, in her earlier career as one of the city's foremost trial lawyers, litigated some of the most important free-speech, women's-rights, and sex-discrimination cases in Massachusetts. (Disclosure: Judge Gertner was Harvey Silverglate's law partner for 16 years.) Even the most authoritarian, male-chauvinist pig on the bench, however, would have to conclude that these ordinances are plainly unconstitutional. Although it seems ridiculous that citizens must resort to litigation to get the city to update its antiquated laws, nothing else has worked. Attorneys at TH&T have engaged in discussions with attorneys from the Boston Police Department, but they yielded no progress. As for why the city is so strongly resisting change, the most likely explanation is simple inertia. As Baird explains, governments are reluctant to change unless someone hauls them into court: "A lot of government is about crisis management, and unless you force them to change, they won't." The only remaining question is how much taxpayers' money will the city waste before it either caves in or loses at trial. Stay tuned.