UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| COMMUNITY ARTS ADVOCATES, INC.<br>and STEPHEN H. BAIRD,<br>　　　Plaintiffs,<br><br>v.<br><br>CITY OF BOSTON,<br>　　　Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL ACTION NO. 04-11618-NG |

## STATUS REPORT AND RENEWED REQUEST FOR DECLARATORY AND

### INJUNCTIVE RELIEF

The Plaintiffs respectfully submit this status report in advance of the September 15, 2005 hearing. As the court is aware, the City of Boston repealed Boston Municipal Ordinance § 16-12.24 and its Boston Police Rules 75 and 403 that had previously been enforced for many years to abridge First Amendment rights of street performers and the public generally. The City had the opportunity to replace the repealed ordinance and rules with reasonable time, place and manner restrictions, as proposed by plaintiffs or otherwise (or to adopt constitutional practices without an ordinance or rule), but instead elected to rely inconsistently on its continuing noise ordinance (16-26) and to allow or even encourage continuation of some of the unconstitutional restraints. Plaintiffs acknowledge that the repeals and related announcements at police precincts have had the effect of expanding access of some musical street performers to public spaces. That said, there remain substantial systemic problems well beyond occasional instances of random rogue officers.

First and foremost, there are directed actions of the City of Boston Police Department

and Parks Department Police (both represented by the City of Boston legal department in this action) contrary to the ordinance repeal and related announcements, that are not only capable of repetition and evading review but in fact being repeated regularly with no further abatement in sight. Second, there is chronic ambiguity in the situation presenting dilemmas to police officers and higher City officials who tend to react in ways in which the First Amendment has the least priority.[1] Third, the City of Boston has refused to acknowledge the unconstitutionality of the repealed ordinance and rules, instead merely spinning its actions to repeal the ordinance and rules on the ground that the ordinance was "antiquated" and acknowledging no other basis.[2] As a result, if the City has a new sentiment to recapture heritage of a quaint past, that would lead to the reinstatement of the restrictions of the repealed ordinance directly or indirectly as a matter of practice (the present situation). Fourth and finally, there has been and there is still ongoing privatization of public space that should only be done, if done at all, with protection of free expression rights.[3] But in fact this is presently happening in a manner that derogates from such

---

1 There is a remaining ambiguity about the definition of "street artists" and whether it includes non-musicians, such as visual artists. This remains a concern because visual artists are being told that they need vendor's licenses in order to draw and sell their work. *See* Declaration of Jeff Kesses. The court in *Bery v New York*, 97 F. 3d. 689 (2d Cir. 1996), held that New York City's "requirement that [artists] be licensed in order to sell their artwork in public spaces constitutes an unconstitutional infringement of their First Amendment Rights." *Id.* at 698.

2 The City has argued: "Contrary to Plaintiffs numerous statements to the contrary, the City has never stated or acknowledged that Boston Municipal Ordinance § 16-12.24 and Boston Police Rule 75/403 were unconstitutional." *See* Defendant City of Boston's Reply in Support of Its Motion to Dismiss, fn 8. *See also*, the Mayor's letter to City Council asking for repeal on the "antiquated" basis.

3 In particular, many street performers are being prevented from performing on the sidewalks around Faneuil Hall and Quincy Market. The First Amendment status of these sidewalks has already been decided in *Citizens to End Animal Suffering v. Fanueil Hall Marketplace, Inc.*, 745 F. Supp. 65 (D. Mass. 1990). When granting an injunction enjoining the Marketplace from preventing plaintiffs from distributing literature about animal cruelty, the court held that the walkways around the Marketplace, "are used for access, for strolling about the Marketplace, and as a 'historic pedestrian connection' to the purely and traditionally public adjoining areas...Although sidewalks are not public fora per se...the facts here establish that these lanes must be considered...public fora." *Id.* at 75. See also, Goldstein v. Town of Nantucket et al., 477 F. Supp. 606, 609 (D. Mass. 1979) ("The requirement of merchants' approval [of street musicians] is irreconcilable with freedom of expression. It is unqualified censorship and it is just what the First Amendment forbids." (declaratory and injunctive relief granted).

rights. The accompanying declarations show these systemic problems and the need for

completion of the work of this case by declaratory and injunctive relief against persistent

practices that undermine the effect of ordinance repeal.

For example, Darrell Keighley, a street performer since May 2004, has been told several

times this Summer that he could not play his instrument with an amplifier. In particular, as

recently as September 1, 2005, Mr. Keighley was approached by two police officers who

informed him that he needed a permit to play his music and that a Captain Anderson, from the

A-1 police station ordered police officers to shut down all performers who did not have a permit.

When Mr. Keighley followed up with the police station, he was once again, told that he needed

an entertainment permit to use his amplifier, he could be stopped merely if a police officer heard

him, the police did not have to measure his decibel level to determine that he was above it and

that Captain Anderson did indeed send police officers to shut all performers down. Finally, Mr.

Keighley was informed by a police officer that he needed to obtain a permit from the Downtown

Crossing Merchants' Association to perform in Filene's Park. *See* Exhibit 1- hereto- Declaration

of Darrell Keighley, dated August 10, 2005, Exhibit 2- hereto- Supplemental Declaration of

Darrell Keighley dated September 6, 2005 and Exhibit 3- hereto- September 2005 Declaration of

Stephen Baird. Amplifier usage is not an *ipso facto* violation of a noise ordinance. Electronic

shaping of music can be an element of expression apart from volume enhancement.[4] Moreover,

the noise ordinance has been applied arbitrarily and inconsistently as shown in the above cited

declarations.

---

4 *See Casey v. City of Newport*, 308 F.3d 106, 121 (1st Cir. 2002) (McAuliffe, D.J. concurring).

Another example of the persistent problem occurred on or about July 10, 2005 to performers Lisa Housman and David Falk. While performing in the Boston Commons, a Parks Department Police Officer informed them that they needed an amplifier permit. When Ms. Housman and Mr. Falk attempted to obtain an application for the necessary permit, the only one they could find was entitled "Application for a One-Time Entertainment License," hardly appropriate for street performers. *See* Exhibit 4- hereto- Declaration of Lisa Housman and David Falk.

A third example of the misinformation being disseminated (and implemented) by the various police departments took place in Downtown Crossing involving a tap and hip-hop dance group. This group was first told that they needed a permit, then after going to the police station and City Hall, and of course told that City permits were no longer necessary but then were told that they needed a permit from the Downtown Crossing Merchants' Association. These documented examples show only a few among the many breaches of First Amendment rights of street performers (including musicians and visual artists) that have occurred since this Court's June status conference. Several of these performers want to file separate civil rights actions but for the moment are willing to rely on this suit to gain relief. All have been law abiding and refrained from civil disobedience. *See* Exhibit 3.[5]

This case has come a long way since it was filed and the City of Boston understands the situation, but this Status Report and the enclosed declarations show that there are significant continuing problems. The case is not moot and the *de facto* relief obtained so far is partial and far

---

5 See cases cited at n. 3, supra.

from adequate. There has been an insufficient abatement of unconstitutional practices of the City of Boston.

These problems are ongoing, inevitably continuing and likely worsening, with or without regulations or ordinances. The City's Motion to Dismiss should be denied. Plaintiffs and persons similarly situated and/or represented by them[6] need a declaration of right and a court order enjoining the City of Boston and its various police departments[7] from interfering with their First Amendment Rights.

Respectfully submitted,

**COMMUNITY ARTS ADVOCATES,
INC. and STEPHEN H. BAIRD,**
By their attorneys, Plaintiffs,

/s/ Jerry Cohen
Jerry Cohen, BBO# 089400
Barbara Green Whitbeck, BBO #634343
Stephen Y. Chow, BBO #082990
PERKINS SMITH & COHEN LLP
One Beacon Street, 30th Floor
Boston, Massachusetts 02108
(617) 854-4000

September  12, 2005

<u>Certification Under Local Rule 7.1</u>

I, Jerry Cohen, hereby certify that on August 30, 2005, I conferred in good faith with Thomas Donohue, counsel for the City of Boston, pursuant to Local Rule 7.1(a)(2), regarding the above status report and renewed request and was not able to obtain a meeting, a joint statute report or otherwise narrow or resolve the issues presented above.

/s/ Jerry Cohen
Jerry Cohen

---

6 (Performance artists in musical, dance, magic, mimes and visual arts)

7 Boston Police, Boston Municipal Police and the Park Rangers

## <u>CERTIFICATE OF SERVICE</u>

I, Jerry Cohen, hereby certify that a true copy of the foregoing Status Report and Renewed Request for Declaratory and Injunctive Relief was served upon the following counsel by email and first-class mail, postage prepaid, on this the 12th day of September, 2005:

> Ronald G. Nelson, Esq.
> City of Boston Law Department
> City Hall, Room 615
> Boston, MA 02110
> Thomas R. Donohue, Esq.
> City of Boston Law Department
> One City Hall
> Boston, MA 02110

> <u>/s/ Jerry Cohen</u>
> Jerry Cohen

31622-2 statusreport.doc

# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

COMMUNITY ARTS ADVOCATES, INC. )
And STEPHEN H. BAIRD, )
      Plaintiff, )
       )
       )
v. )            CIVIL ACTION NO. 04-11618-NG
       )
CITY OF BOSTON, )
      Defendant. )
       )

## DECLARATION OF DARRELL S. KEIGHLEY

I, Darrell S. Keighley, declare and state as follows upon personal knowledge:

1.    I have performed publicly as a street performer since May 2004. I am a vocalist, accompanying myself on acoustic guitar, both of which are amplified. My volume levels are consistant and considerate of the locations I play. My sound source is a battery-powered 50 watt amplifier, with a 10" speaker.

2.    During the 2004 performance season, I had a valid Itinerant Musician License.

3.    I currently reside in Foxboro, Massachusetts.

4.    I have often performed publicly in the streets and parks of the City of Boston (the "City"). In the past I have been told by the City of Boston police that I could not perform in various areas around the City of Boston. In particular, in early July 2004, a police officer told me that I could not play "in sight of City Hall", when I was playing in Sam Adams park, by Fanuel Hall. In addition, on or about April 24, 2005, police claimed there were noise complaints and asked me to move from the corner of Winter Street and Tremont Street. Finally, on or about July 20, 2005, a uniformed officer told me that I could not play my instrument with an amplifier.

Signed under the pains and penalties of perjury, this the   10th   day of August, 2005.

                                      
Darrell S. Keighley

# EXHIBIT 2

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

COMMUNITY ARTS ADVOCATES, INC.    )
And STEPHEN H. BAIRD,             )
     Plaintiff,                 )
                                  )
v.                                )CIVIL ACTION NO. 04-11618-NG
                                  )
CITY OF BOSTON,                   )
     Defendant.                 )
                                  )

### SUPPLEMENTAL DECLARATION OF DARRELL S. KEIGHLEY

I, Darrell S. Keighley, declare and state as follows upon personal knowledge:

1. On or about September 1, 2005, I was entertaining in Downtown Crossing, at the small park, adjacent to Filene's, at the intersection of Washington and Franklin Streets. Two uniformed police officers approached me and informed me that I needed a permit to continue. When I informed them that the Police Rules and Ordinances were repealed, they told me to go to City Hall to get a permit. I was also told that the Captain of the A-1 police station sent police officers out to shut down the performers.

2. I immediately called the Ruggles Street Police Headquarters, and I was told that indeed permits were no longer needed. My call was forwarded to the Boston Police Legal Office, and I was told an attorney would return my call, as soon as possible. After this call, I talked with another police officer, who told me to go to City Hall, as Downtown Crossing was one of the "permit required areas". When I arrived at City Hall, I was now told to go to One Ashburton, which is a State Office Building.

3. Next I went to Precinct A-1 and spoke with an Officer Mullen, who showed me a memo, from the Precinct Captain, that stated that no permits were required, but that there was still a noise ordinance, and amplified musicians may not exceed 70 decibels, at 100 feet. The BPD legal Office Attorney called, during this reading, and was read the same Ordinance. It was referred to as an "End Around."

4. On the way home, I stopped at Ruggles Street again and spoke with several officers about what I would need to perform the next day. They suggested that I return and talk with the Licensing Officer.

5. On or about September 2, 2005, I returned to Ruggles Street and spoke with the Desk Sergeant, who arranged a meeting for me with Captain Anderson, of

Precinct A-1. I proceeded to Precinct A-1, where I first met the officer who had stopped me the preceeding day. He informed me that the actual reason I was stopped was that I needed a permit from the Downtown Crossing Merchant's Association to perform where I was. That was not told to me at the time I was stopped. Subsequently, I met with the Captain, and I was told that I needed an entertainment permit, from City Hall, to use amplification, and I could be stopped from performing if an officer just heard me and felt I was too loud, that the police did not need to actually measure my decibel output, and that he did indeed send out police officers to shut all the performers down.

6.    Following discussion of the Federal Court Civil Action, I was granted permission to continue, as long as there were no complaints.

Signed under the pains and penalties of perjury, this the _____ day of September 2005.


_____
Darrell Keighley

# EXHIBIT 3

Exhibit 3

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **COMMUNITY ARTS ADVOCATES, INC.** ) | |
| **And STEPHEN H. BAIRD,** ) | |
|     **Plaintiff** ) | |
| ) | |
| **v.** ) | **C. A. NO. 04-11618-NG** |
| ) | |
| **CITY OF BOSTON,** ) | |
|     **Defendant** ) | |
| ) | |

## SEPTEMBER 2005 DECLARATION OF STEPHEN BAIRD

I, Stephen Baird, declare and state as follows upon personal knowledge except as otherwise stated:

1. I am the Executive Director of Community Arts Advocate, Inc. ("CAA"), a Plaintiff in this lawsuit. I am also myself a Plaintiff in this lawsuit. Based on recent events, I submit this further declaration. The below statements are made on personal knowledge, except where otherwise indicated. I gave prior declarations in connection with this case.

2. I was in court at the hearings held in December of 2004, where counsel for the City of Boston represented in open court that Boston Police Rules 403 and 75 and City of Boston ordinance § 16-12.24 were not being enforced and were due to be repealed. In addition, at the June 2005 status conference, counsel for the City of Boston suggested that the present case was now moot, due to such repeals. This declaration and accompanying declarations of others show that is not the case and that the City of Boston, and the Boston Police Department, are still limiting First Amendment Rights of street performers.

3. On August 30, 2005, as Director of CAA, I held a press conference and invited the City of Boston to participate. They declined to respond to my invitation. Attached to my press release, I included language for a proposed ordinance which addressed uses of amplifiers with respect to present noise ordinances, reasonable hours for performers, and a definition of "Street Artists." *See* Exhibit A hereto - Press Release. In addition, I was instrumental in the permissive ordinance passed in Cambridge that applies to Street Artists, and the resulting successful monitoring by non-police officials, as featured recently in a Boston Globe article. *See* Exhibit B hereto - September 4, 2005 *Boston Globe* article. Finally, as reflected in previous declarations, I have been involved in achieving similar street performer ordinances and abatement of unconstitutional restrictive practices and rules in several cities all around the United States.

4. As Director of CAA, I have continued to receive complaints since the June status conference of unlawful enforcement of the unconstitutional substance rules that have been formally repealed. Such enforcement has continued to have a chilling effect on street performers in their busiest season. In particular, magician Jason Gardner was using a small wireless microphone, but was told he needed a permit for using any amplification. In addition, at Sam Adams park, Mr. Gardner was involved in a discussion with a man, presumably a merchant, who said he couldn't perform as a magician there. *See* Exhibit C hereto- Declaration of Jason Gardner. Further, musician Bobby Bishop was concerned about performing prior to hearing about the present lawsuit. On June 24, 2005, after learning about the progress of this action, Mr. Bishop attempted to perform on the Boston Common, but was told by a park ranger that he could not use amplification, but was allowed to continue as long as he kept it low. Mr. Bishop is not likely to perform without some further clarification of the present case. *See* Exhibit D hereto-Declaration of Bobby Bishop. Like other performers, Bishop and I use amplifiers as distinct artistic media apart from volume enhancement. We do abide by applicable noise ordinances. He and others have been threatened several times by police officers who allegedly can rule *ipso facto* against amplifiers without making any measurements or estimations of noise, even though the applicable Boston ordinance requires a threshold of certain decibel levels at a certain distance per defined measuring instrument calibration.

5. In addition, I have personal knowledge that the City of Boston is requiring vendor licenses for all visual street artists. In particular, on June 19, 2005, artist Jeff Kesses was told that in order for him to be able to draw and sell his work in the Boston Common he was required to obtain a vendor's license. After following up with the Boston Parks Department, who referred Mr. Kesses to the Boys and Girls Club of Boston, he was told that if he paid $250.00 per month in "rent" he could get a permit to sell his work. In addition, on June 25, 2005, Mr. Kesses was asked to leave the sidewalk near Boston City Hall because he didn't have a permit. *See* Exhibit E hereto- Declaration of Jeff Kesses.

6. I have personal knowledge that on occasion, since the ordinance and police rules were repealed, the City of Boston, through the Mayor's office and the Boston Police Captain have been arbitrarily stopping all performers without notice. In particular, on September 1, 2005, just two days after the August 30, 2005 press conference, musician Darrell Keighley was stopped from performing at Downtown Crossing and was told he needed a permit. When Mr. Keighley attempted to resolve the matter through City Hall and the Ruggles St. Police Headquarters, he was told that the police officers are aware that permits are not needed anymore, but that a Captain Anderson sent out officers to stop all performers without permits, in this area. *See* Supplemental Declaration of Darrell Keighley. *See* Declaration of Lisa Housman.

7.  I have personal knowledge that Boston Police Officers and Boston Park Rangers are not using instrumentation to measure the decibel levels of performer's amplifications, yet performers are being stopped if they are using amplification. In particular, when Mr. Keighley attempted to follow up with further questions about what exactly he needed to perform, as stated above, he was told, by Captain Anderson, that he needed an entertainment permit for his amplifier, that he could be stopped if a police officer merely heard him performing and that the police didn't have to measure his decibel level. *See* Supplemental Declaration of Darrell Keighley.

8.  I am reliable informed that at the present time, the City of Boston is giving performer choice and control to the merchant associations at Sam Adams Park and Downtown Crossing, which excludes most street performers and visual artists.

9.  I have personal knowledge and/or other reliable information of many other artists who have been unlawfully stopped (before and after the June status conference) from performing, including (among others):

    (a)    Cyrus Brooks and the Old School Drop Outs hip-hop, tap and break dance team were shut down on September 1, 2005 at Downtown Crossing, after being told by police he needed a permit, then after going to precinct A-1 being told they did not need a permit, then trying to perform again and being told by a police officer they needed a permit from the Downtown Crossing Merchants' Association and after all the runaround unable to perform at all.

    (b)    The Breeze Team, The Transformers and the Floor Lords and other break dance troupes were shut down at Sam Adams park and Downtown Crossing this Summer under similar circumstances.

    (c)    Visual artists other than Mr. Kesses have been totally suppressed (except for the iconic Sidewalk Sam), the police totally ignoring the *Goldstein* and *Mastrovicinzo* cases.

    (d)    A bucket drummer, whose name I did not catch was shut down the same day as Mr. Keighley at Downtown Crossing. He has also been shut down this Summer at Kenmore Square, Newbury Street, Downtown Crossing and Sam Adams Park.

Signed under the pains and penalties of perjury, this the ___!2___ of September, 2005.


                                        Stephen Baird

# EXHIBIT A

# Street Arts & Buskers Advocates

*Celebrating self-expression as a basic human right essential for the healthy growth of youth, individuals and communities*

**Community Arts Advocates, PO Box 300112, Jamaica Plain, MA  02130-0030 ● Telephone: 617-522-3407**
**Web site: http://www.CommunityArtsAdvocates.org ● Email: Info@communityartsadvocates.org**

Press Release

Regarding: Boston Street Artists Current Status and ongoing Issues
after revocation of a repressive city ordinance and police rule in Federal Court

When: Tuesday, August 30, 2005 at 10 AM

Where: Boston Common at the  French Fountain, Boston, MA
(Rain site: Perkins, Smith & Cohen, LLP, One Beacon Street, Boston, MA)

Who: Stephen Baird of Community Arts Advocates, Inc., with Alfredo Velasquez, Lisa Housman, Dave Falk, and other artists

Contact:

Stephen H. Baird, Community Arts Advocates, Inc., PO Box 300112, Jamaica Plain, MA 02130-0030 phone: 617-522-3407
email: info@communityartsadvocates.org web site: http://www.communityartsadvocates.org

Jerry Cohen, Perkins, Smith & Cohen, LLP, One Beacon Street, Boston, MA 02108
phone: 617-854-4000, fax:   617-854-4040, email: jcohen@pscboston.com

Statement:

The existence in the City of Boston of Street Artists provides a public amenity that enhances the quality of life and  character of the city and the city seeks to encourage such performances and artists to the extent that they do not interfere with the reasonable expectations of residents to the enjoyment of peace and quiet in their homes or the ability  of businesses to conduct their business uninterrupted.  All seek to balance the Constitutional First Amendment Rights of the Street Artists with those of the residents and businesses of the City of Boston.

The street  artists of the Boston area  have accomplished a revocation of a repressive city ordinance and police rule and an improved protocol for police to deal with street artists. But police compliance with the new protocol has been hit or miss, private businesses are trying to pre-empt public spaces and there remain ambiguities; these still put street artists in fear and limit the public amenity they provide and their freedom of expression. Stephen Baird of Community Arts Advocates, Inc., together with several artists affected by the present problems, will present a press conference on Boston Common at the  French Fountain on Tuesday, August 30, 2005 at 10 AM to show some of the remaining problems, perform in various ways representing the street life contributions of the artists and present a proposed city ordinance for Boston (based on existing and well working procedures in Cambridge and several other U.S. cities).Also presented is a long standing  Code of Ethics for street performers well understood and implemented by most of artists voluntarily.

The proposed ordinance has the following features:

Permitted Activities:

Street Artists may use electric or electronic amplification. The conduct and behavior of all Street Artists will be in compliance with the existing Noise ordinances and codes.

Street Artists may not block the passage of the public through a public area. If a sufficient crowd gathers to see or hear a performer such that the passage of the public through a public area is blocked, a police officer may disperse the portion of the crowd that is blocking the passage of the public, but said police officer shall not cause the performer to leave the location.

Street Artists may accept contributions of money or property at a sidewalk drawing display, sidewalk art display, and performance including the artists own musical and video recordings. Contributions may be received in any receptacle.

Activities by Street Artists may take place between 7:00 a.m. and 11:00 p.m.

No permit is required from the City of Boston or other government agency for such activities within Boston city limits.

The following definitions apply:

--The term, "Street Artists," includes, but is not limited to, the following activities: (a) Acting, singing, playing musical instruments, pantomime, juggling, magic, puppetry, dancing, reciting; (b) Sidewalk Art rendered by Sidewalk Artists working with non-permanent water-soluble media, ie chalk, pastels or watercolors directly upon the pavement.

--The term, "Sidewalk Art," means original works of art including but not limited to pavement renderings as described above and also portable art works displayed upon publicly owned sidewalks and park strip areas, or in city operated parks and the artist making and/or selling such art in such a public space is a Sidewalk Artist. Sidewalk Art does not include: 1) any artwork produced by any person other than the sidewalk artist displaying the artwork, 2) any artwork purchased or taken on consignment and held for resale, or 3) any clothing other than jewelry and other accessories or hand painted or tie dyed garments, which if containing mass produced or commercially manufactured parts, such mass produced or commercially manufactured parts, have been assembled by the artist and are not the predominant element of an item sold.

[NOTE: All this can also be the core of an appropriate ordinance with usual format adjustments for that purpose]

Street Artists Code of Ethics

1. We acknowledge each individual's First Amendment/Self Expression Rights with mutual respect and in cooperative spirit.

2. Spaces are allocated on a first-come-first-serve basis. Artists are encouraged to share spaces.

3. Artists should not set up within 50 feet of another artist(s) without first consulting with that artist(s). Rotating sets
    are encouraged in crowded situations.

4. Artists should generally not be heard more than a 25 foot radius from their performance site. Loud and amplified instruments/voices heard beyond 25 feet are considered an infringement upon other artists' First Amendment/Self Expression Rights.

5. Artists using loud and amplified instruments/voices are encouraged to:
    a. Find locations that conflict or interfere with the fewest artists and cause fewest community complaints.
    b. Turn amplifiers/drums/loud instruments in toward walls and/or baffle with blankets to dampen and confine
        sounds to immediate area.
    c. Schedule and/or rotate performance times that conflict or interfere with the fewest artists and cause
        fewest community complaints.
    d. Consult with other street artists in immediate performing area about volume and seek mutual solutions.

6. Street artists acknowledge the importance of the streets and parks as an historic forum for all artists and community
    members, acknowledge the importance of the cultural diversity expressed on the streets and in parks, and
    acknowledge the importance of the street arts in the continuing growth of a world community.

Background information on court case and Boston street performance history at:
http://www.CommunityArtsAdvocates.org/saahistoryBoston.html

Copy of proposed ordinance PDF format:  http://www.communityartsadvocates.org/images/SAABostonPics/ProposedReg.pdf

Additional interviews can be scheduled upon request.

Contact:

Stephen H. Baird
Street Arts and Buskers Advocates
Community Arts Advocates, Inc.
PO Box 300112
Jamaica Plain, MA 02130-0030
phone: 617-522-3407
email: info@communityartsadvocates.org
web site: http://www.communityartsadvocates.org

Jerry Cohen
Perkins, Smith & Cohen, LLP
One Beacon Street
Boston, MA 02108
phone: 617-854-4000
fax:   617-854-4040
email: jcohen@pscboston.com

# EXHIBIT B

BOSTON SUNDAY GLOBE September 4, 2005

CAMBRIDGE

# Excuse me, do you have a permit to play here?

By Will Kilburn
GLOBE CORRESPONDENT

For decades, the main stage for local street performers has been Harvard Square, where on a typical summer weekend you can find several dozen acts in just a few blocks. You might also encounter, though you'd probably never realize it, street performer monitor.

Meet Michael Young, who act as liaison, cop-of, mediator, and diplomats, police officers...

The incident dates back to 1990, when years of legal battles the city enacted an ordinance that, among other things, established operating hours, maximum volume levels, and a permit system — now required for an act of which a single monitoring began in 1995, and this year three monitors will work a combined 700 hours, Thursday through Sunday from May to October, greatly making sure the rules are followed.

"My friends think its the craziest thing that they've ever heard," says 39-year-old Michael Young, a student at UMass-Boston and a community co-op who monitors performers who play week to week, in his second season as a monitor. "I see myself working with the street performers, almost for them. A lot of times I'll tell them that if you don't have a permit, I can't do anything for you."

On the surface, the job may appear to dampen the spirit of artistic expression. But Young says that all but the newest street performers are generally in favor of monitoring, and that even the newcomers quickly come around once they understand.

Just such a naïve unfolds on a mid-afternoon next to a doorway on Dunster Street. Young waits a short distance away for a young sax player to finish a few notes from "Take Five" and then, almost apologetically, approaches and asks to see his permit. He does not, and protests that

Michael Young, a street performance monitor for the City of Cambridge, talking with Peter Podorsky, who was performing in Harvard Square on a Sunday afternoon. An ordinance limits noise, volume and requires performers to have a permit.


CLOSE STAFF PHOTO/RACHEL HART

freedom to perform is "an important part of the culture."

Young explains the ordinance while assuring him that he won't get busted, just to him that, anyway. As his impasse, the player, 20-year-old Harvard biophysics student Trip Adler, was making his first and only appearance of the year before leaving town for the rest of the summer. By this point, however, the conversation is friendly, and the two shake hands before Young continues on the rounds, checking in with a solo drummer in Winthrop Square, then circling back to the T stop to monitor a conga-and-guitar trio.

Taking code enforcement was a central feature in recent years, the main battleground has long been the volume of music. Many musicians, perhaps surprisingly, side with residents and businesses. "The two most issue can get out of hand," said "C.J." says Baird, founder and executive director of Community Arts Advocates, in a phone interview. "If there's one band that blasts away, it blasts every-one band that blocks out one of the square, then it stops body else out of the square; then it stops being a scene and only becomes a forum for one artist."

The monitors who help keep the forum open are perhaps unique to the

"human stature" that have become a fixture in recent years, the main battleground has long been the volume of music. Many musicians, perhaps surprisingly, side with residents and businesses. "The two most issue can get out of hand..."

People's Republic, Baird, who has taken part in similar disputes over street performance in a number of US cities, says he's not aware of similar program anywhere besides Cambridge. Meanwhile, over at the Cambridge Arts Council, the city agency that enforces the policy, director of community arts Jane Baird says she's also unaware of duplication elsewhere but says she plans to put a mention and with it would spread.

"It makes it very easy for them to know exactly what the guidelines are," she says, noting that the monitors' near invisibility in Harvard Square is also key to the program.

"They're not walking around in uniforms, they're not trying to exert a presence, they're just trying to be there and handle any questions, and offer their assistance when it's needed."

The result is a system that may seem somewhat absurd but is actually very democratic. Performers can't drown of the zone another, and businesses can't designate their stretch of sidewalk as a performance-free zone. Young says that whatever street performer, jug-gler, or artist out front, most appreciate the fact that the ever-changing scene brings in more people and more money.

"If they're here enjoying them-selves with a juggler or a band, they're going to go in and buy one of Hidden Sweets or they're going to eat at Bertucci's," says Young. "Performers see it, they know the benefit to it. An active street life is an active city."

"What you see in Cambridge is a hu-man endeavor that started as soon as there were streets," says artist and activist Baird. The marketplace has always had people communicating and petitioning and doing music and art."

Will Kilburn can be reached at wkilburn@globe.com.

# EXHIBIT C

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JASON GARDNER )
  Plaintiff, )
   )
   )
v. )  CIVIL ACTION NO.
   )
CITY OF BOSTON, )
  Defendant. )
   )

## DECLARATION OF JASON GARDNER

I, Jason Gardner, declare and state as follows upon personal knowledge:

1. I am a street performer specializing in magic and escape. I have also performed as a musician in the past.

2. I have performed publicly as a street performer for 15 years.

3. I currently reside in Cambridge, Massachusetts.

4. I have performed as a street performer in Boston, Massachusetts, Cambridge, Massachusetts, Vermont, Virginia, New York City and around the world.

5. I have often performed publicly in the streets and parks of the City of Boston (the "City"). In the past I have been told by the City of Boston police that I could not perform in various areas around the City of Boston, including on Newbury Street, Lansdowne Street, Sam Adams Park and Boston Common.

6. On Saturday, April 2, 2005, I went to Sam Adams Park, which is also known as Dock Square, with the intention of performing there. As I waited to unpack my bag and begin performing, I began talking to a Boston Police Officer who was working there. I told him I was waiting to begin performing. We were talking when a man, who I did not know but who seemed to work for Faneuil Hall Marketplace, came up and complained to the Boston Police Officer that I was not allowed to perform in Sam Adams Park. The Police Officer, a man named Tom, said that technically I could perform there, but it would be better if I went and performed elsewhere. The unknown man said that if I were performing as a musician he could not stop me, but since I was not a musician then I could not perform there without hiring a City of Boston Police detail and I could not solicit money in any way. The officer said that he was supposed to leave the street performers alone that weekend, and that the Boston Police Department was having a meeting on the following Monday about street performers. He said I was allowed to

perform but that it would be better if I moved somewhere else. The unknown man then said that a truck was coming to unload equipment in the spot where I was setting up anyway.

7.    Because of the confusion, and based in part on the Police Officer's recommendation, I decided to move and to perform on Boston Common instead. I began performing on Boston Common using a small wireless microphone attached to a small portable amplifier. After I had done two shows with the microphone, a Boston park ranger came over to me and told me that I needed a permit if I was going to use any amplification in the park. He said I could leave the park, or I could work without the microphone. I did two more shows without a microphone and then left Boston Common.

Signed under the pains and penalties of perjury, this the 24th day of May, 2005.

_____

Jason Gardner

# EXHIBIT D

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

COMMUNITY ARTS ADVOCATES, INC. )
and STEPHEN H. BAIRD, )
    Plaintiffs, )
     )
v. )       CIVIL ACTION NO. 04-11618-NG
     )
CITY OF BOSTON, )
    Defendant. )

## DECLARATION OF BOBBY BISHOP

I, Bobby Bishop, declare and state as follows upon personal knowledge:

1.    I am a U.K. citizen, now residing in Jamaica Plain, Boston, Massachusetts. Together with my partner Terelle Brown (also of Jamaica Plain, a student at Berklee College of Music) we try to perform reggae, soul and blues music in public spaces in Boston, including MBTA platforms, as well as Boston area clubs. We have been afraid to play before but after hearing about Stephen Baird's free expression activity we tried to play on Boston Common on Friday, June 24, 2005. We use a drum loop recording and we play electric guitar and electric bass.

2.    A park ranger came up to us and said we could not use amplification on Boston Common but he would let us play if we4 kept it low.

3.    Even without special measures to keep it low we do not go above regular noise levels of Boston Common on a sunny weekday. We didn't know what would satisfy the ranger or the standards, if any. We stayed for a while, but faced with the uncertainty we left. We are afraid to try it again without some clarification.

Signed under the pains and penalties of perjury, this the 27th day of June, 2005.

_____
Bobby Bishop

# EXHIBIT E

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

COMMUNITY ARTS ADVOCATES, INC. )
and STEPHEN H. BAIRD, )
      Plaintiffs, )
       )
       )
v. )          CIVIL ACTION NO. 04-11618-NG
       )
CITY OF BOSTON, )
      Defendant. )
       )

## DECLARATION OF JEFF KESSES

I, Jeff Kesses, declare and state as follows upon personal knowledge:

1.     I am a portrait artist. I often perform publicly as a portrait artist, setting up on the streets and sidewalks of the City of Boston and drawing passers-by.

2.     I have worked as a public portrait artist since the spring of 2004.

3.     I currently reside in Boston, Massachusetts.

4.     In September of 2004, I attempted to set up to draw public portraits at downtown crossing in Boston. I noticed that a hat vendor was watching me as I set up. When a Boston Police Officer came by, the hat vendor spoke to the officer. The police officer then came over to me. I showed the officer my Vendor's Permit from the City of Boston. The officer said that the permit was not valid in downtown crossing. The officer said I needed a permit from the Downtown Crossing Association. The Officer said I had to leave. I packed up my materials and left.

5.     I then went to set up by South Station and was able to draw in that space. However, this space is not nearly as good a space as downtown crossing for interacting with passers-by.

6.     I possess a Vendor's Permit from the City of Boston. The City gave me the permit with a map which appears to me to cover most of the City of Boston, including downtown crossing. However, I have been told by police that the Vendor's Permit only permits me to engage in public drawing in certain specified and more limited areas and during certain times.

7.     On Sunday, June 19, 2005, I again attempted to set up to draw publicly in the City of Boston. I set up to draw and sell my drawings around 11am on Boston Common. I was permitted to draw and sell my art until about 2pm. At that time, a Boston Park Ranger named Reggie Sampson came over to me and told me that I had to have a Vendor's

Permit if I wanted to be in Boston Common.

8.  It was my understanding, based on a lawsuit filed by Stephen Baird in Federal Court, that the City had agreed, and the Court had ordered, that artists could draw in the public streets and parks of Boston, and that artists could sell their drawings without a Vendor's Permit. I therefore believed that I no longer needed my Vendor's Permit.

9.  After being told by the Park Ranger that I could not be in Boston Common without a permit, I left Boston Common. On Monday, June 20, 2005 I called the Boston Parks Department to ask why I could not draw on the Common without a permit. I was told that I needed to talk to other officials at the Park Department Offices. Therefore, I went, on Thursday, June 23, 2005, to the Park Rangers' offices at 1010 Massachusetts Avenue in Boston. At that time I spoke with an Official from the Park and Recreation Department. I asked why I needed a permit to draw and sell my art. He told me that he was aware of the Court case, but that he had not been given any clear indication by the City of who could and could not perform in the streets and parks of Boston, and so he was not sure if I could draw in the Common. He said he was looking for answers about that himself. He also told me that I should talk to the Boys and Girls Club of Boston, as they are ultimately responsible for that kind of permitting.

10. I therefore left the Park Rangers' offices and went to the Boys and Girls Club, located at 50 Congress Street in Boston. At those offices, I spoke with Jack Hurley, who is in charge of the Boys and Girls Clubs. I told Mr. Hurley that I had been told I could not sell my art on Boston Common, that I could not draw on Boston Common, and that I was told I needed a permit. I told him that the Park Rangers had directed me to him. He said that they usually prosecute people who sell things without a license fully, but that he would make an exception in my case, since I was an artist and they liked artists. He said that he would only charge me $250 per month in rent in order to get a permit to sell my art. He said that such rent was required to cover costs of liability insurance in case I hit someone while I was selling my art. I declined to pay him any money and I left.

11. On Saturday, June 25, 2005, I again attempted to sell my art in the City of Boston. I set up to draw and sell my art on the sidewalk in front of Boston City Hall, across the street from Sam Adams Park. I was approached by a security guard in a gray uniform with blue patches, and I was told that I could not draw pictures or sell art without a permit. I therefore packed up my materials and left.

12. Based on these incidents I am concerned that I will not be allowed to draw and sell my art in public spaces in the City of Boston, and I am deterred from continuing to try to do so.

Signed under the pains and penalties of perjury, this the 26th day of June, 2005.

_____

Jeff Kesses

# EXHIBIT 4

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **COMMUNITY ARTS ADVOCATES, INC.**<br>**And STEPHEN H. BAIRD,**<br>　　**Plaintiff** | )<br>)<br>)<br>) |
| **v.** | ) **C. A. NO. 04-11618-NG** |
| | ) |
| **CITY OF BOSTON,**<br>　　**Defendant** | )<br>)<br>)<br>) |

## DECLARATION OF LISA HOUSMAN AND DAVID FALK

We, Lisa Housman and David Falk, declare and state as follows upon personal knowledge:

1.　We have been performing publicly as street performers for approximately 3 years.

2.　We currently reside in Cambridge, MA.

3.　On July 10, 2005, after playing guitar and signing for approximately 3 hours, in the Boston Commons, a park officer approached and requested to see our amplifier permit. Although we told her that we did not need one, she insisted that we did and told us where to get one. The park officer let us finish our day, but told us not to come back unless we had the correct permit.

4.　On July 11, 2005, we called the Parks Department to request a permit and were told to download the application from the internet. We were also informed that it would be difficult to obtain a permit during the summer, since there were a lot of park events coming up.

5.    When we downloaded the permits, they were entitled "Application for a

One-Time Entertainment License".  The application asked for what floor

of what premise we were hoping to entertain at, required sign-off by a

district police station and required payment by a certified check or money

order.  This application did not seem appropriate for performers such as

ourselves.

Signed under the pains and penalties of perjury, this the ___30___ day of August 2005.

_Lisa Housman_
Lisa Housman

_David Falk_
David Falk